***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Pfeiffer and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
At the hearing before the deputy commissioner, plaintiff introduced exhibits numbered one through five, all of which are check stubs from the servicing agent for temporary total and temporary partial disability benefits and these exhibits were admitted into evidence by the deputy commissioner in this matter. Defendant introduced into evidence the following exhibits: (1) initial vocational rehabilitation report; (2) status report dated 13 July 2001; (3) letter dated 13 July 2001; and (4) status and closure report dated 27 July 2001 and the deputy commissioner admitted these exhibits into evidence. Subsequent to the hearing, defendant filed a motion seeking to have additional evidence admitted; plaintiff objected to defendant's motion. Defendant's motion to introduce additional evidence is hereby OVERRULED and accordingly DENIED.
All Industrial Commission forms and orders filed in these matters are a part of the record. In addition, incorporated herein by reference is Executive Secretary Tracey H. Weaver's 25 April 2001 Order compelling plaintiff to cooperate with vocational rehabilitation efforts.
 ***********
Based upon the greater weight of the competent and credible evidence of record in this matter, the Full Commission makes the following
 FINDINGS OF FACT
1. At all relevant dates herein, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On 16 November 1996 and 10 September 1999, an employment relationship existed between plaintiff and defendant.
3. On those dates, defendant was self-insured, with Key Risk Management Services, Inc. acting as its administering agent.
4. On 16 November 1996 plaintiff sustained an injury by accident to her shoulder. Plaintiff was first disabled as a result of this injury by accident to her shoulder on 8 July 1997. Defendant thereupon undertook compensating plaintiff with temporary total disability compensation benefits at the weekly rate of $366.02 based upon an average weekly wage of $549.00. Plaintiff's rate of pay in 1996 was $12.42 per hour.
5. Following her initial period of disability after the compensable shoulder injury, plaintiff returned to work at various times for defendant. During these periods of partial disability, defendant compensated plaintiff with temporary partial disability benefits based upon her reduced wage-earning capacity.
6. On 10 September 1999 plaintiff sustained an admittedly compensable injury by accident to her left thumb. Defendant admitted the compensability of and its liability for this injury by accident by virtue of a Form 60 filed with the Industrial Commission on or about 7 April 2000. As a result, defendant undertook payment of temporary total disability benefits at the weekly rate of $203.96 based upon a compensation rate of $305.92.
7. Plaintiff has been totally disabled as a result of his admittedly compensable left thumb injury since 28 March 2000. At some point thereafter, defendant unilaterally changed the applicable compensation rate to $330.46, and plaintiff continues to receive ongoing total disability compensation in that weekly amount. There is no evidence of record from which the Full Commission can ascertain either the reason behind or the calculations used in the $330.46 compensation rate hike.
8. In July 1999, two months prior to her compensable thumb injury, plaintiff received a pay raise to $13.89 per hour. Plaintiff's previous pay rate had been $12.42 per hour. Upon her return to work for defendant after her compensable 1996 injury, plaintiff received $12.42 per hour plus two-thirds of the difference between $366.02 and her post-injury wages.
9. There are no Form 22 wage charts provided from which the Full Commission can ascertain plaintiff's appropriate average weekly wage relating to her 1999 compensable injury. However, the indemnity compensation she received in addition to the wages she earned was intended to bring her up to the 1996 average weekly wage of $366.02.
19. Using the $13.89 pay rate to calculate plaintiff's average weekly wage for her September 1999 injury by accident would be inappropriate in that plaintiff just began earning this wage two months prior thereto, and a claimant's average weekly wage is to be calculated based on that claimant's wages earned in the 52 weeks preceding the date of injury.
20. Based upon the lack of credible evidence behind the $330.46 average weekly wage, and upon the fact that plaintiff's temporary partial benefits after 1996 were based upon an average weekly wage of $366.02, and upon the fact that there is insufficient evidence of record regarding plaintiff's actual wages in the 52-week period preceding the September 1999 injury by accident, plaintiff's average weekly wage herein is found to be $336.02.
21. Defendant initiated vocational rehabilitation through Page Rehabilitation Services, Inc. in January 2001 in an attempt to assist plaintiff in returning to suitable, gainful employment. On 30 January 2001, George Page, a vocational rehabilitation specialist, met with plaintiff, plaintiff's husband, and plaintiff's counsel in the attorney's office. At this initial meeting, plaintiff informed Mr. Page that she normally wore a sling on her right arm and a brace on her left hand, although she wore neither on this occasion. Plaintiff, who was appropriately and well-dressed and neatly groomed, expressed to Mr. Page anger and frustration at the process, and he encouraged her to remain positive and optimistic. Plaintiff's husband also expressed frustration with the way plaintiff's workers' compensation claim had been handled.
22. Mr. Page first located a job opportunity at a jewelry store, after discussing plaintiff's physical limitations with the potential employer. Plaintiff presented for this interview at the jewelry store wearing blue jeans, a sweatshirt, and with both arms in slings. Plaintiff did not appropriately present herself for this interview, and was informed that there was no job available despite Mr. Page having been told earlier that the store was in fact hiring.
23. Thereafter, plaintiff was ordered by the Industrial Commission's Executive Secretary on 25 April 2001 to cooperate with the vocational rehabilitation efforts.
24. Mr. Page continued to search for job opportunities for plaintiff, and by letter dated 13 July 2001, Mr. Page notified plaintiff that he had located several potential job leads, and he instructed plaintiff to make applications at these places of employment as soon as possible. Mr. Page had informed the potential employers of plaintiff's physical limitations.
25. Mr. Page followed-up on these job leads several days later, and learned that plaintiff presented to Ryan's Steakhouse at the busiest time of day and wearing a sling. The manager, who was unable to speak with plaintiff because of the many customers, told plaintiff that the positions had been filled but that she could complete an application; plaintiff declined to do so. When plaintiff presented to First Southern Cash Advance, she was accompanied by her husband and she brought a file of material relating to her case and physical restrictions as well as a bag containing her medication. Plaintiff was not offered a position.
26. Even after being specifically ordered by the Industrial Commission to comply with vocational rehabilitation efforts, plaintiff regularly presented to potential employers wearing blue jeans and with her arms in slings, and with a bag of medication that she showed the potential employers. Her husband also often accompanied plaintiff when she presented to potential employers. Furthermore, despite the potential employers already being aware of plaintiff's physical restrictions, she told employers about her limitations and her frustrations relating to her workers' compensation claim.
27. Mr. Page also had difficulty contacting plaintiff. She failed to respond to several of his letters, and plaintiff's telephone was disconnected during the vocational rehabilitation process, thereby further complicating the process.
28. On 24 July 2001, a meeting at plaintiff's counsel's office was held with Mr. Page, plaintiff, and plaintiff's counsel. Again her husband, who is a physically large man who could be construed as intimidating, accompanied plaintiff. During the course of the events at counsel's office on 24 July 2001, plaintiff's husband made several derogatory comments towards Mr. Page, and even used vulgarities when speaking loudly and in a heated manner to Mr. Page. Mr. Page thereupon closed his file, concluding that under the circumstances, further efforts would be unfruitful.
29. Plaintiff's husband became visibly angry at the hearing before the deputy commissioner, although he did not testify in this matter.
30. The deputy commissioner found based upon plaintiff's demeanor and testimony at hearing, that despite being ordered by the Commission to comply with the vocational rehabilitation process, she instead sabotaged the process and by her actions ensured that she would not be offered a job by any employer with whom she had contact. It cannot be construed as full or reasonable compliance with the vocational rehabilitation process to present to potential employers inappropriately attired; with both arms in slings when the need for that is questionable; with a bag of medication that she presents to the potential employers; with letters and other documentation regarding her physical limitations despite the employers already being aware of her restrictions; accompanied by her physically intimidating husband who has demonstrated, even in court, that he angers easily; and with an attitude that clearly suggests that she does not want to work. Plaintiff has not come forward with sufficient evidence to show that she has in fact complied with these efforts or made any independent efforts to locate suitable employment.
31. By 24 July 2001, the date on which the vocational rehabilitation efforts ceased, plaintiff had failed to comply with the Industrial Commission order requiring her to cooperate with these efforts.
32. Plaintiff is entitled to no indemnity benefits during the period of time that she has refused to accept vocational rehabilitation by her failure to comply therewith after being ordered by the Commission to cooperate. Should plaintiff's refusal cease, she would then again be entitled to ongoing benefits.
33. A proper showing that plaintiff is willing to cooperate with vocational rehabilitation services may include, but is not limited to, the following: plaintiff refraining from bringing her medication with her to job interviews; plaintiff refraining from bringing a list of her physical limitations with her to job interviews; plaintiff refraining from emphasizing her disability to potential employers; plaintiff refraining from bringing her husband to job interviews; plaintiff wearing appropriate attire to signify her interest in the potential employment; plaintiff presenting to potential employers with a positive attitude; and by being available and able to be contacted by the rehabilitation consultant assigned to the case.
 ***********
The foregoing stipulations and findings of fact result in the following additional
 CONCLUSIONS OF LAW
1. Plaintiff sustained admittedly compensable injuries by accident to her shoulder on 16 November 1996 and to her thumb on 10 September 1999. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's applicable compensation rate for both injuries was $366.02 based upon an average weekly wage of $549.00. N.C. Gen. Stat. § 97-2(5).
3. On 25 April 2001, plaintiff was ordered by the Industrial Commission to comply with rehabilitative efforts pursuant to N.C. Gen. Stat. §97-25; Sanhueza v. Liberty Steel Erectors, 122 N.C. App. 603, 471 S.E.2d 92
(1996). However, by 24 July 2001, it was apparent that plaintiff had refused to accept these services, and she and her husband had sabotaged the process to the extent that rehabilitative efforts ceased. Plaintiff is not entitled to any benefits during the period or periods of time that she refuses to accept (by failing to cooperate with) rehabilitative services. N.C. Gen. Stat. § 97-25.
4. Accordingly, defendant is entitled to suspend plaintiff's compensation from 24 July 2001 until such time as plaintiff makes a proper showing that she is willing to cooperate with rehabilitative services. N.C. Gen. Stat. § 97-25; Sanhueza v. Liberty SteelErectors, 122 N.C. App. 603, 471 S.E.2d 92 (1996).
5. Defendant is entitled to a credit for payments made when not due and payable, subject to plaintiff's credit for underpayments made based upon the incorrect compensation rate. N.C. Gen. Stat. § 97-42.
 ***********
The foregoing findings of fact and conclusions of law result in the following
 ORDER
1. Defendant is entitled to suspend plaintiff's temporary total disability compensation as of 24 July 2001 until such time as plaintiff makes a proper showing that she is willing to comply with the rehabilitative services.
2. Defendant is entitled to a credit for payments made when not due and payable, subject to plaintiff's credit for underpayments made based upon the incorrect compensation rate.
3. Defendant is entitled to reinitiate vocational rehabilitative services. Because the relationship between plaintiff and the former rehabilitation consultant is irreparably damaged, defendant should hire a different provider of rehabilitative services.
4. Plaintiff remains under Industrial Commission order to fully cooperate with all reasonable and appropriate vocational rehabilitation services provided by defendant.
Each party shall bear its own costs of this proceeding.
This the 27th day of May 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN